J-S74042-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLYN PAPPERT | : | |
| | : | |
| Appellant | : | No. 3021 EDA 2018 |

Appeal from the PCRA Order Entered September 20, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004546-2010

BEFORE: BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED JANUARY 21, 2020**

Appellant Allyn Pappert appeals from the Order entered in the Court of Common Pleas of Philadelphia County on September 20, 2018, denying his first petition filed pursuant to the Post Conviction Relief Act (PCRA).[1] We affirm.

A prior panel of this Court set forth the relevant facts and procedural history herein as follows:

> Allyn Pappert shot his daughter after an argument about her boyfriend. On January 20, 2012, after a four-day jury trial, [A]ppellant was convicted of third degree murder and possessing an instrument of crime ("PIC"). . . .
> Kathy Pappert, the 41-year-old victim, was dating a man named Jay.[1] Appellant disapproved of his daughter's relationship and was strongly opposed to the couple living together. Appellant once told Linda Pappert, Kathy's mother and his ex-wife, "You know, sometimes I really feel like killing your daughter." (Notes

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

of testimony, 1/18/12 at 26.) He also talked to Linda about shooting Jay with a hollow point bullet, and [A]ppellant also remarked that he "wouldn't think twice" about using such dangerous ammunition on another person. (*Id*. at 25.) When pressed by Linda as to what he would do to hide the body if he killed the victim, [A]ppellant indicated that he "wouldn't want to ruin [his] blender" because "the bones would ruin [the blade]." (*Id*. at 27, 42.) Appellant indicated he was comfortable with going to jail if he was caught as he would receive medicine for his affliction, "have like three meals a day," and be given a "place to sleep." (*Id*. at 27, 30-31.)

On February 14, 2010, the victim had an argument about Jay with [A]ppellant in the rear bedroom of his home. After unsuccessfully calling a taxicab to arrange a ride to Jay's house, the victim told [A]ppellant, "I'm out of here," and [A]ppellant responded by commanding "You ain't going nowhere. Get back in here." (*Id*. at 231.) As the victim attempted to leave, [A]ppellant picked up one of his guns and shot his daughter in the right side of her torso. (*Id*. at 227-229.) The victim staggered down the stairs to the living room, lay down on a sofa bed, and screamed for help. (*Id*. at 98-100.)

Appellant called 911 and the tape was played for the jury. Appellant told the dispatcher that he shot his daughter who had been "bitching and moaning" about having been shot. Appellant expressed that the victim had been "destroying his house" and that he was 64 years old and on disability insurance and could not afford to fix the things she broke. As his daughter was dying, [A]ppellant accused her of continued malfeasance, telling the operators that "she's destroying shit downstairs," and that "she won't listen to me." (Exhibit C-37.)

At approximately 3:55 a.m., pursuant to a radio call, Philadelphia Police Sergeant Jeffrey Rabinovitch arrived to 3184 Belgrade Street. Here, he met Officer Herring who was trying to kick in the front door as he could hear screaming inside. Upon entering the home, Sergeant Rabinovitch observed the victim lying on the bed bleeding. The sergeant asked her if she had been shot and she responded, "My dad shot me" and indicated that [A]ppellant was upstairs. At this time, the SWAT team arrived and the police found [A]ppellant seated at a desk on the phone with 911. As [A]appellant was being arrested, he stated, in a "very casual, nonchalant" manner, that he shot his daughter because "[s]he wouldn't shut up." (Notes of testimony, 1/18/12 at 96-104.) The officer also testified that [A]ppellant's demeanor was "disturbingly casual" considering the circumstances. ([*Id*.] at

- 2 -

103.) Several other weapons and "hundreds" of rounds of live ammunition were recovered from the house. (*Id*. at 76-78.)

Detective Nathan Williams interviewed [A]ppellant following his arrest after [A]ppellant waived his **Miranda**[2] rights. The detective testified that [A]ppellant appeared emotionless and confessed to shooting his daughter with his Walther P-99 .40 caliber handgun. He stated that the victim made six calls on his phone, and each one cost him money; he also averred that he was on a fixed income and that the victim had stopped paying him money. Appellant alleged that the victim broke his cordless phone by throwing it against the door. When describing how he shot his daughter, he stated:

> I said, Kathy, if you destroy anything else in this house, then you're going to have to go. You're going to have to pay for it.
> I had the gun in my hand and my finger on the trigger, and it went boom. She was standing right there in the doorway. I had my finger on the trigger because I don't normally keep a bullet in the chamber, just in the magazine, should I drop it or something and it didn't go off.

Notes of testimony, 1/18/12 at 227.

An expert in ballistics, Officer Ronald Weitman, examined the Walther P-99, the projectile recovered from the body, and other ballistics evidence recovered. Officer Weitman explained that the Walther P-99 has a double-Action/single-action trigger with a decocker. (Notes of testimony, 1/19/12 at 18-19.) The officer explained that this weapon is incapable of firing a projectile unless someone physically chambered a round from the magazine. (*Id*. at 28-30.) The gun must either be intentionally put into single-action mode, or else be manually cocked by pulling a mechanism on the gun backward and forward before firing. (*Id*.) The officer also testified that the gun was loaded with hollow-point bullets; these bullets are designed to "mushroom," expand and cause collateral damage, upon impact with human flesh. (*Id*. at 30, 47.) Dr. Marlon Osbourne, the assistant medical examiner, determined the cause of death was a homicide. (Notes of testimony, 1/18/12 at 154-158.) Dr. Osbourne testified that the bullet traveled through the victim's arm, liver, interior vena cava, and stomach; ultimately, the bullet lodged underneath her skin. (*Id*. at 171.)

Appellant testified at trial. He admitted to owning multiple guns and having ammunition in the house. (Notes of testimony, 1/19/12 at 117.) He habitually carried a gun around the house. (*Id*. at 119.) While he did not like the victim's boyfriend, he testified he had never threatened to kill him or his daughter. (*Id*. at 120.) His defense was that the shooting was an accident, which contradicted several accounts he had previously given that he shot his daughter because she "wouldn't shut up." His explanation at trial was:

> And I goes -- got there. I turned around and I seen [sic] the gun laying [sic] on the desk. I go, oh, man, you ain't taking my gun. Like that.
>
> I went to grab it, and I'm not [sure] -- I'm watching her so she don't [sic] turn around and see where I'm gonna hide it. I grab it like that there. I slid it to the edge of the desk. And I guess I over shot it, and it dropped. I grabbed it. When I grabbed it, it went off.

*Id*. at 133-134. He also explained that he had told the 911 dispatchers that his daughter was "bitching and moaning" because he thought she might be "upset" about having been shot. (*Id*. at 145-146.)

On cross-examination, [A]ppellant denied telling his [ex-] wife that he had a hollow-point bullet with the victim's boyfriend's name on it and that he would use a blender[3] to dispose of the victim's body in the event that he murdered her. (*Id*. at 185.) Appellant testified that the only thing the victim broke before he shot her was his cordless phone, and he admitted that he had once been told that hollow point bullets were capable of "a one[-] shot drop." (*Id*. at 194, 213.)

On January 20, 2012, the jury returned guilty verdicts for third degree murder and PIC. On May 1, 2012, the court imposed a sentence of 20-40 years' imprisonment for murder and a consecutive 1-2 year sentence for PIC. Appellant filed post-sentence motions on May 4, 2012; the motions were denied on August 17, 2012. Appellant filed a timely notice of appeal[.]. . .

_____

[1] We note Jay's surname is not of record.
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[3] Appellant referred to the appliance as a juicer.  (*Id.*)

- 4 -

*Commonwealth v. Pappert*, No. 2570 EDA 2012, unpublished memorandum at 1-6 (Pa.Super. filed November 25, 2014).

Following a review of Appellant's challenges to the sufficiency and weight of the evidence and numerous claims of trial court error, this Court affirmed Appellant's judgment of sentence. The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on April 29, 2015.

On December 9, 2015, Appellant filed the instant PCRA petition, *pro se*, wherein he raised numerous claims of ineffective assistance of counsel. Counsel was appointed, and on March 10, 2017, the PCRA court permitted counsel to withdraw. On July 5, 2017, the PCRA court appointed new counsel. On February 7, 2018, counsel filed a no-merit letter pursuant to *Commonwealth v. Turner,* 544 A.2d 927 (Pa. 1988), and *Commonwealth v. Finley*, 550 A.2d 213 (Pa.Super. 1988) (*en banc*). Therein, counsel opined that the issues Appellant had raised in the *pro se* PCRA petition were meritless and that after a review of the record, counsel could discern no issues of arguable merit. On March 14, 2018, Appellant filed a *pro se* opposition/response to counsel's *Turner*/*Finley* letter.

After reviewing Appellant's *pro se* response and upon its review of the record, the PCRA court found the issues Appellant had raised in his PCRA petition were meritless and that no other issues of arguable merit existed. The PCRA court granted counsel's motion to withdraw and issued notice of its intent to dismiss Appellant's petition without conducting an evidentiary

hearing pursuant to Pa.R.Crim.P. 907 on June 28, 2018. On September 20, 2018, the PCRA court dismissed the petition.

Appellant filed a timely notice of appeal on October 2, 2018, and both Appellant and the PCRA court have complied with Pa.R.A.P. 1925. In his appellate brief, Appellant presents the following Statement of Questions Involved:

> I.    Did the court below err when it did not find trial counsel ineffective in failing to properly prepare the case for trial?
>
> II.   Did the court below err when it did not find that plain error resulted in a denial of a fair trial and that Appellant was denied due process of law during direct and collateral review?
>
> III.  Was Appellant denied due process of the law during initial collateral proceedings before the court below?

Brief for Appellant at 6. As Appellant's arguments pertaining to these issues overlap, we will consider them together.

Appellant first asserts that trial counsel was ineffective for failing to call a forensic psychologist and a ballistician at trial. Brief for Appellant at 14-15, 19. He further claims he was entitled to relief in light of counsel's numerous failures to object to instances of alleged prosecutorial misconduct. *Id*. at 21-27. In addition, he asserts trial counsel failed to object to what he deems to be various times the trial court committed "plain error" during trial. *Id*. at 27-32.

Our standard and scope of review of claims of trial counsel's ineffective advocacy is as follows:

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.

*Commonwealth v. Grayson*, 212 A.3d 1047, 1051 (Pa.Super. 2019) (citation omitted).

We begin with a presumption that Appellant's counsel was effective. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). Therefore, [t]o establish a claim of ineffectiveness, Appellant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa.Super. 2007) (citation omitted). A petitioner must establish (1) that the underlying claim has arguable merit; (2) that counsel lacked a reasonable basis for his action or inaction; and (3) but for the act or omission in question, the outcome of the proceedings would have been different. *Commonwealth v. Washington*, 927 A.2d 586, 594 (Pa. 2007). "A claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet any of these prongs." *Id.* (citation omitted).

In addition, we have explained:

[A] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. *See Commonwealth v. Jones*, 583 Pa. 130, 876 A.2d 380, 385 ( [Pa.] 2005) ("if a petitioner raises allegations, which, even if accepted as true, do

- 7 -

not establish the underlying claim ..., he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043-44 (Pa.Super. 2019), *appeal denied*, 216 A.3d 1029 (Pa. 2019).

With regard to Appellant's allegations he had been denied due process of law and a fair trial in light of counsel's failure to presents expert witnesses, the record reveals that prior to jury selection, the trial court asked Appellant if he suffered from any mental illness, to which he responded in the negative. N.T., 1/17/12, at 6. Moreover, Appellant acknowledges in his appellate brief that such expert testimony would not have been exculpatory to his theory that the shooting had been accidental. Brief for Appellant at 17.

Furthermore, Appellant fails to proffer evidence that a forensic psychiatrist was available and would have testified on his behalf. Similarly, Appellant did not show that a ballistics expert who would have been willing to testify favorably for him existed. To the contrary, on cross-examination, Dr. Marlon Osbourne, a forensic pathologist with the Philadelphia Medical

Examiner's Office, testified that the trajectory of the bullet wound Kathy Pappert had sustained was not inconsistent with the defense theory that the killing had been accidental. N.T., 1/18/12, at 188-190. Thus, a ballistics expert would have added little to Appellant's case. In light of the foregoing, Appellant has failed to show the result of the proceeding would have differed had such expert testimony been presented. Therefore, Appellant has not established prejudice, and these claims fail. **Sandusky**, **supra**.

Appellant next claims trial counsel had been ineffective for failing to object to instances of prosecutorial misconduct during trial. Under 42 Pa.C.S.A. § 9541(3), a petitioner may be eligible for relief if his or her allegations of error have not been litigated previously or waived. As the trial court notes, **see** Trial Court Opinion, filed 3/1/19, at 5, the instances of alleged misconduct relating to Linda Pappert and Michael Mitchell have been previously litigated and denied by this Court on direct appeal. **Commonwealth v. Pappert**, No. 2570 EDA 2012, unpublished memorandum at 16-19 (Pa.Super. filed November 25, 2014). The Pennsylvania Supreme Court did not grant further review of these claims. As such, Appellant is not entitled to further consideration of these issues herein.

Moreover, in his appellate brief Appellant admits that counsel did, in fact, object to the majority of the remainder of the alleged prejudicial and/or inadmissible evidence he discusses. Brief for Appellant at 21-24; N.T., 1/18/12, at 18-19, 25-28, 30-31, 50-51; 1/19/12, at 4-6. Therefore, contrary

Appellant's assertions, trial counsel cannot be deemed ineffective for failing to raise a meritless claim. **See Commonwealth v. Fears**, 86 A.3d 795, 809 (Pa. 2014). As such, there is no arguable merit to these arguments.

Appellant also argues trial counsel was ineffective for his failure to object to what Appellant claims had been prosecutorial misconduct for the following response by Linda Pappert to a question posed by the prosecutor:

The prosecutor: How do you know [Appellant]?

Linda Pappert: It's her father.

N.T., 1/18/12, at 13.

Appellant baldly argues "[t]rial counsel fails to object to this highly prejudicial statement that [Appellant] is not a person, but an it! Brief for Appellant at 23 (emphasis in original).

The prosecutor did not act inappropriately in questioning Linda Pappert as to how she knew Appellant. Rather, such a question is customary, and in posing it, the prosecutor in no way attempted to illicit a negative response. Also, she did not ask follow up questions regarding Linda Pappert's pronoun choice. Moreover, Appellant fails to specify how this single response was so prejudicial that it entitles him to a new trial. **Sandusky**, **supra**. To the contrary, trial counsel's objection may have had that effect in that it would have brought more attention to what was otherwise a brief answer. No relief is due.

- 10 -

Finally, Appellant objects to statements the prosecutor made during closing argument. The remarks at issue were as follows:

> ... and one night throughout the course of the trial, my daughter - I fell asleep in her little twin bed, and I tried to sneak out of the bed and go back to my own bed. And then at about 3:30 in the morning, I see a little head coming around the side of bed and she says, Mommy, why did you leave me? And in that moment, I thought about [Appellant], and I thought about a father and daughter, and I couldn't help in that moment with my daughter-- and many of you during that small moment with your own kids might think, oh, that poor heartbroken little girl. She's so upset because I left the room.
>
> Now, I say that because many of you, when you come in here, you don't leave your lives outside that door. You think about this case in the context of real life. And in order to understand what happened on February 14, 2010 at 3184 Belgrade Street, you have to put this in the context of [Appellant], of the relationship he had with his daughter. The evidence in this case is that this man is in an unnatural relationship of a man who is selfish and cold and cruel. . . .

N.T. Trial, 1/20/12, at 65-66.

When analyzing the propriety of a prosecutor's comments during closing argument, our Supreme Court has stated:

> "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Pa.R.P.C. 3.8, Comment. This unique role in our justice system, however, does not prevent prosecutors from fairly responding to defense arguments with force and vigor, provided they are not injecting their own personal opinion.
> A prosecutor enjoys reasonable latitude during closing arguments, and may advocate with force, vigor, and oratorical flair. This latitude is not unrestrained, and closing argument must be based upon matters in evidence, or upon the legitimate inferences that can be drawn from that evidence. Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds

- 11 -

a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

***Commonwealth v. Brown***, 196 A.3d 130, 176–77 (Pa. 2018) (case citations and some quotation marks omitted).

In considering the prosecutor's anecdote, the PCRA court opined:

As discussed in counsel's [Finley] letter, "Prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." Commonwealth v. Judy, 978 A.2d 1015, 1020 (Pa.Super. 2009) (quoting Commonwealth v. Chmiel, 889 A.2d 501, 544 (Pa. 2005.)) The prosecutor's comments were proper because they were based upon the evidence derived from Linda Pappert's testimony and the inferences that arose therefrom to prove that petitioner had the specific intent to murder his daughter. The prosecutor's statement was brief and was used to illustrate the relationship between Appellant and his daughter. This claim is without merit. Accordingly, counsel's position in his [Finley] letter was supported by the record.

Trial Court's Opinion, filed 3/1/19, at 6 (footnote omitted).

Because we conclude that the prosecutor's summation was not improper, we likewise reject Appellant's contentions that trial counsel had been ineffective for failing to object and/or pursue this claim on appeal. The prosecutor's observation that the evidence herein presented a selfish and cruel man in an unnatural relationship with his daughter was illustrated by the evidence presented trial, including Appellant's own admissions during the 9-1-1 call and his trial testimony. Appellant shot his daughter in her torso after an argument concerning her boyfriend and indicated to a 9-1-1 operator he did so because she was destroying his home and would not shut up. Officers

who responded were struck by the calmness of Appellant's demeanor as his child lay dying in his home.

This Court previously recounted on direct appeal the ample evidence presented at trial to support the jury's finding that Appellant killed his daughter. As we stressed:

> There is no doubt in this matter that the Commonwealth proved appellant killed the victim with malice. When viewed in the light most favorable to the Commonwealth, the evidence demonstrates that [A]ppellant shot his daughter through her torso, a vital part of the body, with a deadly weapon; such is sufficient to permit an inference of malice necessary for murder in the third degree. *Gooding*, *supra*. Overwhelming evidence was presented, including three inculpatory statements from appellant, including a confession, that [A]ppellant shot the victim after an argument as she "wouldn't shut up" and was "destroying his house." The argument was about her boyfriend, whom appellant admittedly disliked. The Commonwealth also demonstrated malice through appellant's assertions on the 9-1-1 tape. Moreover, expert testimony was presented that the gun used must either be intentionally put into single-action mode, or else be manually cocked by pulling a mechanism on the gun backward and forward before firing.
>
> The Commonwealth also presented testimony that [A]ppellant had previously threatened to kill the victim and her boyfriend; in fact, he had threatened to shoot her boyfriend with the same type of hollow-point bullet. Appellant also indicated he would dispose of the victim's body in a blender if he ""actually killed her" if it would not damage the blender.
>
> Clearly, the jury was permitted to reject [A]ppellant's self-serving claim that the gun had accidentally discharged. Additionally, ""the Commonwealth need not prove motive in order to establish the existence of malice." *Commonwealth v. D'Ambro*, 456 A.2d 140, 143 n.5 (Pa. 1983). *See also Commonwealth v. Manchas*, 633 A.2d 618, 623 (Pa.Super. 1993), *appeal denied*, 651 A.2d 535 (Pa. 1993). Suffice it to say that the trial court's verdict was supported by evidence legally sufficient to sustain a conviction for third degree murder.

Certainly, such behavior by a father toward his daughter is atypical, and the prosecutor's acknowledgement of that during closing was proper.

Lastly, Appellant alleges that trial counsel had been ineffective for failing to move for a mistrial or for the trial court's recusal in light of numerous evidentiary rulings, some of which, ironically, were in Appellant's favor, and others of which this Court previously determined to be proper. (Brief for Appellant at 30). However, Appellant's bald claims of prejudice do not afford him relief.

"The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Commonwealth v. Dip*, 2019 WL 5201821, at *2 (Pa.Super. Oct. 16, 2019) (citation omitted). Appellant completely fails to demonstrate how the trial court's rulings were based on partiality, or how the outcome of the proceeding would have differed if trial counsel had sought recusal. Thus, this claim fails.

In light of all of the foregoing, we find no merit to Appellant's issues raised on appeal and affirm the trial court's Order denying him relief under the PCRA.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/21/20</u>